UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
RICHARD ZECHER, ROBERT YADEGAR,
ZECH CAPIATAL LLC, Y-GAR CAPITAL LLC,
RICHARD N. ZECHER 2010 FAMILY TRUST
FOR THE BENEFIT OF EVAN GREGORY
ZECHER and RICHARD N. ZECHER 2010
FAMILY TRUST FOR THE BENEFIT OF
RACHEL JOY ZECHER,

                              Plaintiffs,               **REPORT AND**
                                                  **RECOMMENDATION**
          -against-                     CV 18-5072 (SJF)(AYS)
                                         CV 19-5629 (SJF)(AYS)

VINCE HOLDING CORP., JILL GRANOFF,
LISA KLINGER, MARK BRODY, BRENDAN
HOFFMAN, DAVID STEFKO, MARC J. LEDER,
SUN CAPITAL PARTNERS, INC., SUN
CARDINAL, LLC, SCSF CARDINAL, LLC and
SUN CAPITAL PARTNERS MANAGEMENT
V, LLC,

                           Defendants.
------------------------------------------------------------X

**SHIELDS, Magistrate Judge:**

       This is an action alleging violations of the Securities and Exchange Act of 1934 (the

"Exchange Act"). Specifically, Plaintiffs allege violations of Section 10(b) of the Exchange Act,

and Rule 10b-5 promulgated thereunder, as well as Section 20(a). (See Docket Entry, herein

("DE"), [13].) Presently before this Court, on referral from the Honorable Sandra J. Feuerstein

for Report and Recommendation, is Defendants' motion to dismiss the presently operative

pleading, Plaintiffs' Amended Complaint (the "Amended Complaint" or the "AC"). (See Order

dated Feb. 7, 2020.)

       The referral order in this matter (hereinafter referred to as "Zecher I") also referred to this

Court a pending motion to dismiss, which was filed on February 6, 2020, in a case involving the

same facts and securities fraud claims raised here.  That case, referred to herein as "Zecher II," appears as CV 19-5629, and the referred motion appears as DE [25] therein.  In addition to incorporating by reference the arguments made in Zecher I, Defendants raise a statute of limitations argument in support of their motion to dismiss in Zecher II.

For the reasons set forth below, the Court recommends that the motion to dismiss this matter be granted in its entirety, without leave to re-plead.  Because the substantive allegations of the complaint in Zecher II (and Defendants' arguments with respect thereto) are the same as those dismissed here, this Court also recommends that the District Court dismiss Zecher II, on the merits and without leave to re-plead.  These rulings make it unnecessary to rule on the separately argued statute of limitations argument raised in Zecher II.  They also render moot the presently pending motions (DE [31] herein and DE [19] in Zecher II) to consolidate Zecher I and Zecher II.

<u>FACTUAL BACKGROUND</u>

I.    <u>Basis of Facts Recited Herein</u>

In support of their motion, Defendants rely on documents filed publicly with the Securities and Exchange Commission (the "SEC"), which are referred to in the Amended Complaint, as well as press releases and news articles that are also referenced therein.  As demonstrated below, all such documents are appropriate to consider in the context of this motion to dismiss.  They are discussed in detail as necessary, and are annexed to the Declaration of Robert N. Kravitz, Esq. (DE [26]) as follows:

- Exhibit 1:    Transcript of Earnings Call regarding Q2 2015, held on September 3, 2015 (DE [26-1]);

- Exhibit 2:    Vince 2016 10-K filed with SEC on April 28, 2017 (DE [26-2]);

- Exhibit 3:    Vince 2014 10-K filed with SEC on March 27, 2015 (DE [26-3]);

2

- Exhibit 4:    Vince press release dated April 14, 2017, entitled "Vince Holding Corp. Announces Delay in Fiscal 2016 10-K filing", filed with the SEC on April 14, 2017 (referenced in Amended Complaint at paragraphs 11, 191 and 192) (DE [26-4]);

- Exhibit 5:    Vince press release dated April 28, 2017, entitled "Vince Holding Corp. Reports Fourth Quarter and Fiscal Year 2016 Results," filed with the SEC on April 28, 2017 (referenced in Amended Complaint paragraph 194) (DE [26-5]);

- Exhibit 6:    Article entitled "Five Years In the Making: How the New Dynamics AX Reflects Microsoft's Cloud Evolution," published on MSDynamicsWorld.com on November 29, 2015 (referenced in Amended Complaint paragraph 60) (DE [26-6]);

- Exhibit 7:    Article entitled "Microsoft's New Accounting Software Goes 'All-in' on Azure Cloud," published on *Fortune.com* on March 8, 2016 (referenced in Amended Complaint paragraph 62) (DE [26-7]);

- Exhibit 8:    Microsoft Press Release, "Microsoft Delivers Enterprise-Class ERP to the Cloud," dated March 9, 2016 (referenced in Amended Complaint paragraph 63) (DE [26-8]);

- Exhibit 9:    Vince 2015 10-K, filed with SEC on April 14, 2016 (DE [26-9]);

- Exhibit 10:    Vince 2013 10-K, filed with SEC on April 4, 2014 (DE [26-10]);

- Exhibit 11:    Statement of Changes in Beneficial Ownership (Form 4) for Defendant Hoffman, filed with the SEC on June 16, 2016 (DE [26-11]);

- Exhibit 12:    Statement of Changes in Beneficial Ownership (Form 4) for Defendant Stefko filed with the SEC on May 18, 2016 (DE [26-12]).

## II.    The Parties

Plaintiffs are a group of individuals and family trusts (collectively, "Plaintiffs") who have purchased tens of millions of dollars' worth of the common stock of Defendant Vince Holding Corp.

The name "Vince" is a luxury apparel brand. Defendant Vince Holding Corp. ("Vince" or the "Company") is located in New York.  (AC ¶ 32.)  It was previously known as Apparel Holding Corp. and Kellwood Holding Corp. ("Kellwood").  It was incorporated in 2008 in connection with the acquisition of Kellwood by affiliates of Sun Capital Partners ("Sun

3

Capital"), a private equity firm, and its affiliates.  (DE [28-3] (proxy statement annexed to Plaintiffs' opposition to motion to dismiss).)  Vince is majority owned by Sun Capital.  The individually named Defendants served as officers and/or directors of Vince during various time periods referred to in the Amended Complaint (the "Individual Defendants").  (AC ¶¶ 33-38.)

III.    The IPO

 From 2006 through 2013, Vince operated as a business unit of Kellwood.  On November 27, 2013, Sun Capital spun off Vince in an initial public offering (the "IPO").  (AC ¶ 3.)  Prior to the IPO, Vince was a diversified apparel company operating a broad portfolio of brands that included Vince.  (DE [28-3].)  After the IPO, non-Vince businesses were separated from the Vince business, and acquired by Kellwood.  (DE [26-10] at 5 (Vince 10-K for year ending 2014).)  Thereafter, the Vince business became the sole business of the Company.

IV.    The Shared Services Agreement

 In connection with the IPO, Vince entered into an agreement with Kellwood referred to as the "Shared Services Agreement."  (DE [26-10] at 5, 15 and Item 13.)  Pursuant to that agreement, Kellwood agreed to provide Vince with certain support services in various areas, including information technology and human resources systems that are relevant to this lawsuit. (DE [26-10] at 14.)  These services are broadly referred to herein as "ERP" (enterprise resource planning) services and systems.  They include distribution, information technology and back office systems.  (DE [26-10] at 15.)  It was understood that at some point following the IPO, the ERP services provided under the Shared Services Agreement, i.e., the technology services provided by Kellwood, would terminate.  At that point, the responsibility for carrying out such services would be transitioned to Vince.  It was thus clear that Vince would become responsible

4

for providing ERP services to the Company, either on its own, or pursuant to agreements reached with third-party vendors.

V.    Disclosures Regarding the Shared Services Agreement and
      The Transition of Responsibility for ERP Systems to Vince

Since the IPO, Vince has made numerous public disclosures (including in its disclosures to the SEC), regarding the Shared Services Agreement and the Company's transition to providing its own ERP systems.  Those disclosures have repeatedly described the nature of the services provided by Kellwood.  They state the proprietary nature of those systems, as well as the critical functions that they provide to Vince's business.  Most importantly, in each and every public filing, Vince advised investors of the possible negative consequences that might be associated with the transition of ERP systems from Kellwood to Vince.

Without repeating the verbatim text of each of Vince's disclosures, it is clear (and Plaintiffs do not deny) that Vince made investors well aware that during the immediate time period after the IPO, Vince would be relying on ERP services provided by Kellwood under the Shared Services Agreement.  See e.g., DE [26-10] (2013 Form 10-K) ("Kellwood "provides [Vince] with certain key services for our business.").  It also disclosed that those systems were unique and might be difficult and expensive to replace.  See e.g., DE [26-10] at 14 (describing systems as "highly customized or proprietary" which might not be able to be replaced "at favorable costs and on favorable terms").

Further, Vince's public disclosures warned that difficulties in transition and systems integration could result in adverse financial consequences.  Thus, Vince warned that the transition "could materially harm our business, financial condition, results of operations and cash flows."  E.g., DE [26-10] at 15.  Such warnings regarding the possibility of negative financial consequences related to ERP systems transition appear in numerous Vince filings that are before

5

the Court.  See e.g., DE [26-3] (2014 10-K) at 7, 14 (disclosing as a "Risk Factor" that if Vince could not successfully transition [technology services then provided by Kellwood] to [Vince's] own systems" Vince's "systems . . . business financial condition, results of operations and cash flows could be materially harmed."); see also DE [26-3] at 14; 2015 10-K, DE [26-9] at 7.

As time went on, Vince disclosed the progress of its transition from Kellwood's ERP systems to its own.  Thus, for example, Vince's 2015 10-K (DE [26-9]) referred to Vince's progress in implementing its own systems, stating that it had completed transitioning certain back office functions previously performed by Kellwood under the Shared Services Agreement. (DE [26-9] at 7.)  It also stated that Vince was working on developing its own information technology infrastructure and was in the process of implementing its own ERP system, point of sale systems, e-commerce platform and supporting systems.  (DE [26-9] at 7.)

The information provided to investors was not always positive.  Thus, both in an April 14, 2017 press release, and a Form 8-K filed with the SEC (DE [26-4]), Vince advised investors that it was delaying the release of its financial results for the fourth quarter for the fiscal year ended January 28, 2017.  The delay was related to the transition from Kellwood's services, and the integration of Vince's new ERP systems.  (DE [26-4] at 6.)  Defendant Brendan Hoffman described the IT migration, stating that the Company was experiencing integration difficulties, and that certain issues identified with the new systems would "result in one or more internal weaknesses in internal controls."  Hoffman further stated that the Company was in the process of correcting system deficiencies, and that corrections were expected to be completed during fiscal year 2017.  (DE [26-4] at 6); see also April 28, 2017 8-K DE [26-5] (noting that Vince's results for the fourth quarter of 2016 came in below the Company's expectations "due primarily to

challenges related to [Vince's] systems conversions, which led to delayed shipments . . . [a]s well as lower than expected performance" in Vince's Spring collection), DE [26-5] at 6.

In sum, it is more than fair to summarize Vince's public filings, after the IPO and prior to 2017, as informing investors of the Shared Services Agreement, the proprietary nature and importance of the systems provided pursuant thereto, and the possible negative financial impact that might be associated with Vince's transition to its own ERP systems.

VI.    Non-Vince Documents Referred to in the Amended Complaint and Considered Herein

In addition to the publicly filed SEC documents described above, Plaintiff refers to certain articles, and a Microsoft press release in the Amended Complaint (hereinafter the "Non-Vince Documents").  The Non-Vince Documents refer to Microsoft's development of a cloud-based ERP system.

First, Plaintiffs refer to an article published online in InformationWeek.com.[1]  That article is dated March 17, 2015 and discusses, among other things, Microsoft's cloud-based AX products.  Along with a general discussion, the article refers to pent-up demand for a cloud-based system.  It quotes Microsoft's Mike Ehrenberg as declining to state numbers but admitting that "a few customers" had moved into production without awaiting Microsoft's blessings.  (AC ¶ 57.)

Plaintiffs refer next to a November 29, 2015 Article entitled: "Five Years In the Making: How the New Dynamics AX Reflects Microsoft's Cloud Evolution," published on MSDynamicsWorld.com.[2]  This article reported that Microsoft was officially unveiling its ERP product in a new direction.  (AC ¶ 60.)  It refers to Microsoft's use of its Azure cloud computing,

---

[1]        https://informationweek.com/software/enterprise-applications/microsoft-cloud-first-push-shines-in-crm-lags-in-erp/a/d-id/1319502

[2]        https://msdynamicsworld.com/story/power-bi/five-years-making-how-new-dynamics-ax-reflects-microsofts-cloud-evolution

and its years-long efforts moving in a cloud-based direction to build its "new AX."  Id.  Thus, the article states that Microsoft "has been lining up its cloud ERP strategy over several years, starting with broad goals of five to six years ago and, over time, moving toward some of the specific technology choices and functional capabilities that will be featured in the new AX release." The article goes on to describe Microsoft's activities from 2010 through the 2015 date of the article.

Next, Plaintiffs refer to an article dated March 8, 2016, published on Fortune.com, entitled "Microsoft's New Accounting Software Goes 'All-in' on Azure Cloud."[3]  This article similarly reported on Microsoft's cloud-based ERP product.  (AC ¶ 62.)  Like the MSDynamicsWorld Article, this article referred to Microsoft's use of cloud computing in its new ERP product.  There, it was reported that AX-7 was to run on Microsoft's Azure public cloud infrastructure.  The Amended Complaint quotes directly from this article, including Microsoft's comment regarding the importance of ERP products, stating that "if there's one thing business customers don't want to take chances on, it is their accounting application, aka enterprise resource planning (or ERP) software."  (AC ¶ 62.)  What the article does not say is that customers would, indeed, be taking a chance on their business if they signed up for the Microsoft product.

The next article referred to in Plaintiffs' Amended Complaint is a Microsoft Press Release dated March 9, 2016, entitled: "Microsoft Delivers Enterprise-Class ERP to the Cloud."[4] (AC ¶ 63.)  There, Microsoft released information regarding its cloud-based AX-7 product to the public, noting that the product was available in 137 countries, and stating that customers from around the world were using the cloud to accelerate and transform their businesses.

---

[3]     https://fortune.com/2016/03/08/microsoft-dynamics-azure/
[4]     https://news.microsoft.com/2016/03/09/microsoft-delivers-enterprise-class-erp-to-the-cloud/

Representatives from companies already using AX-7 (as of the date of that press release) commented on the product's value to their businesses.  Id.

THE PLEADINGS AND THE MOTION TO DISMISS

I.      The First Complaint: Motion to Dismiss and Leave to File an Amended Complaint

Plaintiffs commenced this action on September 7, 2018.  (DE [1].)  Defendants filed a motion to dismiss on December 3, 2018.  (DE [17].)  On December 17, 2018, Plaintiffs filed a motion seeking an extension of time in which to file an amended complaint.  (DE [20].)  In an Order dated December 17, 2018, then-assigned District Judge Bianco granted Plaintiffs' motion, and allowed an amended complaint to be filed by January 28, 2019.  (Order dated Dec. 17, 2018.)  Judge Bianco also adopted the parties' proposed briefing schedule with respect to a motion to dismiss the soon-to-be filed amended complaint.  Id.

II.     The Amended Complaint

On January 28, 2019, Plaintiffs filed the Amended Complaint.  In that pleading, Plaintiffs allege that Vince, through statements attributable to the Individual Defendants, made, or caused to be made, materially false and misleading statements that artificially inflated the price of Vince common stock.  Such statements are the basis of the securities fraud violations alleged in the Amended Complaint.  (AC ¶ 39.)  They seek damages for losses alleged to have been suffered in connection with their acquisition of Vince common stock during the "Relevant Period," which Plaintiffs define as between March 19, 2015 and May 19, 2017.

The Amended Complaint is eighty-four pages long and contains 251 separate statement paragraphs.  (DE [22].)  While the pleading is lengthy, its factual allegations can be summarized easily.  It discusses and references the public documents set forth above, focusing on the IPO, the Shared Services Agreement, public statements made by Vince in its SEC filings, and the

9

Company's calls to shareholders.  It also discusses Vince's transition to an ERP system independent of the system provided by Kellwood pursuant to the Shared Services Agreement.

The Amended Complaint also refers to the Non-Vince Documents.  These documents provide background and are stated to support Plaintiffs' allegations regarding the Dynamics AX System.

Plaintiffs' background allegations agree with most of the factual statements set forth in Vince's publicly filed documents.  Thus, Plaintiffs allege the fact (not disputed by Vince) that ERP systems in general, and those provided by Kellwood in particular, were critical to Vince's business.  For example, Paragraph 49 of the Amended Complaint states that "in the years following the IPO, the success of the Company increasingly depended on the performance of its direct-to-consumer segment, which in turn, relied on a dependable ERP infrastructure."  (AC ¶¶ 49, 50 (explaining that "Properly functioning ERP Systems are important to Retail Operations").)

After setting forth undisputed facts regarding the Shared Services Agreement, the Amended Complaint turns to facts surrounding Vince's transition to providing its own such systems.  ERP systems are defined in the Amended Complaint as "integrated software packages designed to achieve the goal of proper integration to support day to day business processes."  Id. ¶ 52. The Amended Complaint explains the importance of "middleware" in what the pleading refers to as "traditional" ERP systems.  Such middleware is stated to be critical to the integration of multiple tiers of operating platforms.  Id. ¶ 51.  Turning to the specifics of how so-called "traditional" ERP systems function, the Amended Complaint states that traditional systems used specialized middleware to achieve integration.  Such middleware is alleged to have been expensive to maintain.  Middleware is also recognized in Plaintiffs' pleading to employ integration processes that might lag behind real time and be difficult and costly to scale.  Id. ¶ 52.

As set forth in the Amended Complaint (and undisputed by Defendants), Vince experienced problems when it transitioned to its own ERP system.  Those problems of integration are alleged to have been known to Company managers, as well as particular employees who are named in the Amended Complaint.  (AC ¶¶ 93-94.)  Plaintiffs' allegations regarding Vince's transition to its own ERP system set the stage for their pleading of particular false statements.  Those statements focus on Vince's decision to use Microsoft's cloud-based Dynamics AX System as its ERP solution.

Plaintiffs acknowledge that Vince disclosed that it was transitioning to its own system based upon a system from Microsoft Dynamics AX, which was "cloud based."  (AC ¶ 75.) However, the Company is stated to have "offered very few details about the new ERP platform." (AC ¶ 76.)  In particular, Plaintiffs allege that Vince disclosed only that it was developing its system based upon "a" system from Microsoft, without disclosing that its new system was a "beta" version of the new Dynamics AX platform.  Id. ¶ 80.

Against this factual backdrop, Plaintiffs allege that Vince's statements regarding the Company's transition to an independent ERP system were false because they failed to disclose the following material facts:

- that the Company was developing an ERP system around a new technology that had not been proven;

- that the Company was developing its ERP platform using an unfinished beta-version of AX-7 that had been released for testing and development purposes only;

- that the Company was not developing middleware to perform the necessary data integration processes; and

- that the foregoing conduct substantially increased the risk of severe complications during the transition, and the likelihood that Vince's business and results of operations would be adversely affected.

(AC ¶ 112 (hereinafter, the "Paragraph 112 Statements").)

The Paragraph 112 Statements are continually referenced in the Amended Complaint and provide the factual basis for Plaintiffs' claims of securities fraud. (AC ¶¶ 113, 116, 118, 120, 122, 124, 126, 128, 130, 132, 134, 136, 138, 140, 142, 144, 146, 148, 152, 156, 158, 160, 162, 164, 166, 168, 170, 172, 174, 176, 178, 180, 182, 184, 186, 188, 190.)

III.   The Present Motion to Dismiss

On March 29, 2019, Defendants moved to dismiss, pursuant to then-District Judge Bianco's scheduling order. (Electronic Order dated Dec. 17, 2019; DE [24].) This matter was thereafter re-assigned to the Honorable Sandra J. Feuerstein. (Electronic Order dated May 31, 2019.) At a conference held on November 26, 2019, Judge Feuerstein established a briefing schedule for the motion to dismiss in Zecher II and set a status conference to be held on May 5, 2020. (DE [34].) On February 6, 2020, Defendants moved to dismiss Zecher II. On February 7, 2020, the motions to dismiss in both this case and Zecher II were referred to this Court for Report and Recommendation. (Electronic Order dated Feb. 7, 2020.)

Defendants move to dismiss pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. They also move to dismiss pursuant to the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(1) (the "PLSRA"). The Court turns to discuss the standards applicable to the motion, as well as the merits thereof.

DISCUSSION

I.   Legal Principles

A.   Standard on a Rule 12(b)(6) Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570

(2007)); see also Arista Records, LLC v. Doe 3, 604 F.3d 110, 119-20 (2d Cir. 2010).  Facial plausibility is established by pleading factual content sufficient to allow a court to reasonably infer the defendant's liability.  Twombly, 550 U.S. at 556.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 555.  Nor is a pleading that offers nothing more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" sufficient.  Iqbal, 556 U.S. at 678 (2009) (quoting Twombly, 550 U.S. at 555).  As required in the context of this motion, the factual allegations in the Complaint, though disputed by Defendants, are accepted to be true, and all reasonable inferences are drawn therefrom in favor of the Plaintiff.

While facts to consider in the context of a Rule 12 motion to dismiss are generally limited to those set forth in the pleadings, a court may consider matters outside of the pleadings under certain circumstances.  Specifically, in the context of a Rule 12(b)(6) motion, a court may consider: (1) documents attached to the complaint as exhibits or incorporated by reference therein; (2) matters of which judicial notice may be taken; or (3) documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint.  Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002); see also International Audiotext Network, Inc. v. American Tel. and Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995).  Pursuant to these standards, the Court deems it appropriate to consider, in addition to the pleadings, all of the documents referred to above, which are publicly filed and/or referenced in the Amended Complaint.

B.    Pleading a Plausible Securities Fraud Claim under the FRCP and the PSLRA

1.    Pleading Section 10(b), Rule 10-b(5) and Section 20 Liability

Plaintiffs allege claims pursuant to 15 U.S.C. § 78j(b) ("Section 10(b)") and Rule 10-b(5) promulgated thereunder, 17 C.F.R. § 240.10-b5, as well as 15 U.S.C. § 78t (a) ("Section 20").

To state a claim under Section 10(b) and Rule 10-b(5), a plaintiff must allege a material misstatement indicating an intent to deceive in connection with the purchase or sale of a security. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197 (1976).  Thus, to avoid dismissal, a complaint must plausibly allege a material misrepresentation (or omission), made with scienter (a wrongful state of mind), in connection with the purchase or sale of a security.  See Singh v. Cigna Corp., 918 F.3d 57, 52 (2d Cir. 2019).  Plaintiff must also plausibly allege reliance, economic loss, and loss causation.  Id.  As to materiality, misrepresentations alleged to constitute fraud are material only if "there is a substantial likelihood that a reasonable person would consider [such statements] important in deciding whether to buy or sell shares of stock."  Id. at 63 (citation omitted).  Such statements must, from the point of view of a reasonable investor, have "significantly altered the 'total mix' of information made available."  Id. (citation omitted). The statement must be misleading when evaluated "not only by 'literal truth,'" but also by "context and manner of presentation."  Id. (citation omitted).

To state a claim of "controlling person" liability under Section 20(a), a plaintiff must allege a primary violation by the controlled entity, control of the primary violator by the named defendant, and that the named defendant was, in some meaningful way, a culpable participant in the entity's fraud.  See ATSI Commc'ns. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007).

    2.    <u>Pleading Requirements of Rule 9(b) and the PSLRA</u>

All of Plaintiffs' claims are subject to the heightened pleading standards imposed by both Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(1) (the "PSLRA").  Thus, Plaintiffs must allege facts that give rise to an inference of scienter with particularity.  <u>See</u> <u>Singh</u>, 918 F.3d at 52; <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1175 (2d Cir. 1993) (Rule 9(b)); 15 U.S.C. § 78u-4(b)(1) (PSLRA).  To comply with this pleading standard, a securities fraud plaintiff must specify the statements alleged to be fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent.  <u>See</u> <u>Mills</u>, 12 F.3d at 1175.

Moreover, statements relied upon must be plausibly alleged to have been false at the time they were made, and not with the benefit of 20/20 hindsight.  <u>See</u> <u>San Leandro Em. Med. Grp. Profit Sharing Plan v. Philip Morris Cos.</u>, 75 F.3d 801, 812-13 (2d Cir. 1996); <u>In re Lululemon Sec. Litig.</u>, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), <u>aff'd</u>, 604 F. App'x 62 (2d Cir. 2015); <u>C.D.T.S. No. 1 v. UBS AG</u>, No. 12 Civ. 4924, 2013 WL 6576031, at *3 (S.D.N.Y. Dec. 13, 2013) (rejecting "fraud by hindsight" pleading).

Finally, it is critical to note that it has long been held that allegations that amount to nothing more than "corporate mismanagement" do not constitute the type of conduct sufficient to support a claim of securities fraud.  <u>See</u> <u>Sante Fe Indus. Inc. v. Green</u>, 430 U.S. 462, 479 (1977); <u>Field v. Trump</u>, 850 F.2d 938, 948 (2d Cir. 1988).

With these standards and the facts described above in mind, the Court turns to the merits of the motion to dismiss.

II.    <u>Disposition of the Motion</u>

As noted, the Amended Complaint focuses on the support services provided by Kellwood to Vince under the Shared Services Agreement, and Vince's transition to providing those services on its own. As a careful review of the Amended Complaint makes clear, Plaintiffs' allegations of fraud appear in the Paragraph 112 Statements. In these statements, as described above, Plaintiffs take issue with the decision to use a new Microsoft product. In particular, they quarrel with the decision to use the Microsoft Dynamics AX ERP system, which they describe as a new cloud-based product. According to Plaintiffs, the product chosen for use was allegedly still in beta form and did not use middleware. Vince's decisions regarding the Microsoft product are alleged to have increased the possibility that the Company would suffer the negative financial consequences as to which Vince investors had been warned. The Paragraph 112 Statements, however, even if true, do not state a plausible claim of securities fraud.

There is no question that Vince disclosed the possibility of negative financial consequences as a result of the transition from Kellwood's ERP system to a Vince system. Thus, as the many public disclosure documents summarized above state, Vince made investors well aware from the time of the IPO, and continuing from 2014 through 2017, that Kellwood provided critical technology support services to Vince. Those documents also made abundantly clear that Vince would need to transition those services to technology provided by Vince, or pursuant to an agreement with a third party vendor. Importantly, Vince warned investors, in each and every SEC public filing and press release, that this transition of critical support services might not be smooth. Thus, Vince repeated that the implementation and migration of Kellwood's systems to its own might materially harm Vince's business, financial condition, results of operation, and cash flow.

16

Vince's clear disclosures regarding the possible negative effects that might be associated with the transition of services from Kellwood to Vince make it impossible for Plaintiffs to argue that Vince made some sort of misrepresentation regarding that transition.  Any such argument must be rejected as it puts Plaintiffs in the position of arguing that Vince warned of a possible negative event, and when that event occurred, the warning itself amounted to fraud.  This is precisely the type of argument specifically rejected by the Second Circuit.  See Singh, 918 F.3d at 59-60 (rejecting securities fraud claim based upon disclosure of importance of regulatory compliance, followed by regulatory violations).

Plaintiffs attempt to avoid this obvious flaw in their pleading by focusing not on the fact of the transition, but on the way in which the Company decided to handle it.  Business decisions regarding the transition are alleged to have increased the possibility of negative financial outcomes.  Thus, the Amended Complaint seeks to find fraud based upon the particular cloud-based Microsoft system chosen by Vince when transitioning from the technology provided by Kellwood.  According to Plaintiffs, Vince failed to disclose its use of a so-called "beta" version of Microsoft software that failed to provide the middleware necessary to properly migrate data.  The undisclosed use of this particular product is alleged to have caused data migration problems that resulted in negative financial consequences.  Even assuming the truth of Plaintiffs' allegations regarding the use of a beta version of the Microsoft product (an allegation that is disputed by Vince), Plaintiffs fail to state a claim.  This is because Second Circuit precedent clearly bars such business decisions from the scope of conduct that must be disclosed to avoid securities fraud liability.   To be clear, allegations regarding choices as to the use of a particular software amount to nothing more than, at best, corporate mismanagement. For this reason alone, Plaintiffs fail to state a plausible claim of securities fraud.

17

Technology is an ever-changing landscape. The fact that a technology purchased on a particular date (even the technology of a known brand) did not meet a client's expectations, or became associated with post-purchase implementation difficulties, is more likely a description of every-day corporate experience, and less likely a description of securities fraud. Plaintiffs allegations fall squarely within the scope of corporate decision-making that may be unwise, but the failure to disclose such decisions does not amount to securities fraud. See In re Crocs, Inc. Sec. Litig., 774 F. Supp.2d 1122, 1146 (D. Colo. 2011) (finding that statements regarding system migration problems do not constitute securities fraud); C.D.T.S. No. 1, 2013 WL 6576031, at *7 (noting that "it is well established in the Second Circuit that Section 10(b) claims are not supported if the crux of allegations is that a company was mismanaged" rather than "deception or manipulation").

Moreover, the Court holds that the particular type of software used by a company is not material information, within the meaning of the Exchange Act, that must be disclosed to investors. Apart from reflecting a corporate management decision, information regarding purchase and use of particular software does not fall into the category of information that an investor would consider "important in deciding whether to buy or sell shares of stock." Singh, 918 F.3d at 63. Vince disclosed its need to transition from Kellwood's ERP systems. It also disclosed that the Kellwood systems would be difficult to replace, and that transition might result in negative financial consequences. These statements constitute sufficient disclosure of facts regarding ERP systems transition. The further disclosure argued by Plaintiffs to have been necessary, i.e., going into the weeds of particular software decisions, would not, from the point of view of a reasonable investor, have "significantly altered the 'total mix' of information made available." Id.; see also Kleinman v. Elan Corp., 706 F.3d 145, 152-53 (2d Cir. 2013)

18

(disclosure of particular information necessary only if necessary to make information that is disclosed not misleading).  Thus, the information regarding software choice was not material, and failure to make such disclosure cannot have violated the Exchange Act.

In sum, the Amended Complaint, even when interpreted in the light most favorable to Plaintiffs, must be dismissed under Rule 12(b)(6) because, even over the course of eighty-four pages, it alleges only Plaintiffs' disagreement as to Vince's corporate management and fails to set forth any material non-disclosures.  It therefore fails to state a plausible claim of securities fraud.

Finally, the Amended Complaint must also be dismissed for failure to meet the pleading requirements imposed by Rule 9(b) and the PSLRA.  Plaintiffs' allegations as to Vince's use of the wrong (and allegedly untested) software, fall short of pleading fraud with particularity. Despite the prolix pleading in the Amended Complaint, which is replete with quotes from the press releases regarding Microsoft's products, Plaintiffs fail to allege with any particularity as to why Vince's statements regarding the Shared Services Agreement were false (much less fraudulent), or when they were made.  Importantly, Plaintiffs fail to elaborate on their claims as to the insufficiency of the Microsoft product used, and any of the Defendants' knowledge thereof.  At best, they state only that Vince decided to use a new cloud-based product developed by a well-known company – hardly an allegation sufficient to support a claim of fraud.

For the reasons set forth above, it is respectfully recommended that the motion to dismiss under Rules 12(b)(6), 9(b) and the PSLRA for failure to plausibly plead fraud, much less with the required particularity, be granted.  In view of the recommended dismissal of the Section 10(b) and Rule 10-b(5) claims, Plaintiffs' claims against the Individual Defendants under Section

20 should also be dismissed.  See In re Lululemon Secs. Litig., 14 F. Supp.3d 553, 587 (S.D.N.Y. 2014).

IV.    Dismissal Should be Without Leave to Replead

The Amended Complaint is eighty-four pages long and contains 251 separately stated paragraphs.  Despite failing to state a plausible claim of securities fraud, it is factually detailed, even to the point of identifying individuals by name.  Importantly, the Amended Complaint represents Plaintiffs' second chance to properly plead their claims.  It is difficult to imagine that a third pleading would in any way animate the factual basis for the securities fraud claims sought to be alleged.  Therefore, the Court recommends that the Amended Complaint be dismissed without leave to re-plead.

CONCLUSION

For the foregoing reasons, this Court respectfully recommends that Defendants' motion to dismiss, appearing at Docket Entry No. [24] in this matter, and the motion to dismiss appearing at Docket Entry No. [25] in the case filed under Docket No. 19-5629, be granted in their entirety.  The Court further recommends that those pleadings be dismissed with prejudice, and without leave to further re-plead.  Finally, in view of these recommendations, the Court also recommends that the motions to consolidate, appearing at Docket Entry No. [31] herein, and Docket Entry No. [19] in CV 19-5629, be denied as moot.

OBJECTIONS

A copy of this Report and Recommendation is being provided to all counsel via ECF.  Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of filing of this report.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b).  Any requests for an extension of time for filing objections must be directed to the District

Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or Court of Appeals. Thomas v. Arn, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.").

**SO ORDERED.**

Dated: Central Islip, New York
      April 14, 2020

                            /s/ Anne Y. Shields
                            ANNE Y. SHIELDS
                            United States Magistrate Judge